## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

2022 OCT -7 PM 1:28

CLERK, US DISTRICT COURT

---

Erik Benjamin Cherdak
149 Thurgood Street
Gaithersburg, Maryland 20878
Ph. 202.330.1994
(Service Address)
Email: ebcme@me.com,

*Plaintiff,*

*v.*

Vincent Paul Cottone
28038 Foxrock Court
Bonita Springs, Florida 34135-9137
(Service Address)
Email: vpcott@comcast.net

*and*

Linda Marie Cottone
28038 Foxrock Court
Bonita Springs, Florida 34135-9137
(Service Address)
Email: lmcott@comcast.net

*Defendants.*

---

Case No. 2:22 cv 634 SPC-NPM

### PLAINTIFF'S
### ORIGINAL COMPLAINT [1]

### JURY TRIAL DEMANDED

---

### INTRODUCTION AND FACTUAL BACKGROUND

1.     Plaintiff comes before this Honorable U.S. District Court for the Middle

District of Florida (hereinafter, the "Court") to set forth claims and to move on

---

[1] Plaintiff is presently moving in this case *pro se*. In so doing, Plaintiff has researched this Honorable Court's Local Rules and has prepared and formatted this Original Complaint in accordance with those rules and, in particular, L.R. 1.08 and its typography requirements.



causes of action against the above-named Defendants and on a set of operative facts warranting an award of significant compensatory and punitive damages to be determined by a properly empaneled jury. Plaintiff reserves the right to amend this Complaint on the basis of facts learned through discovery or otherwise and also to name additional parties such trusts that the Defendant are using to attempt to protect some of their assets from recovery by their creditors. As Plaintiff's claims concern intentional torts committed individually and in conspiratorial combination under Florida law, all assets of the Defendants regardless how held or allegedly held are subject to reach by creditors as the law does not countenance the inequitable use of any veiled entity of any type to protect one from the reach of creditors who may have been intentionally harmed by Defendants committing deliberate acts to harm others.

2.     The Defendants must come before the Court to answer for their intentionally tortious conduct and bad acts alone and in conspiratorial combination to defame the Plaintiff *per se* and to seek to deliberately and with absolutely presumed malice aforethought to cause Plaintiff significant harm and mental anguish (both alone and in combination with physical manifestations related to such mental anguish), *inter alia,* by knowingly and falsely publishing written statements that are in and of themselves defamatory *per se* (as libel *per se*) and, in particular, accusing Plaintiff of horrendous and unfounded domestic abuse of family members and, even more egregiously, of child abuse. See Exhibits 1 and

2

2 at ¶¶ 12, respectively (discussed in further detail in ¶ 4, *infra*) "The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occureence [sic] of damage are both presumed from the nature of the defamation." *Wolfson v. Kirk* , 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973).  This case presents particularly disturbing facts as Defendants made their knowingly false statements in written affidavits, see Exhibits 1 and 2, sworn and subscribed to before a Florida Commissioned Notary Public with clear and immutable dual aims (1) to egregiously harm the Defendant through very disturbing and false accusations of abuse and child abuse; and (2) to subvert judicial processes through those written affidavits in courts and before government officials (notaries public) in Florida and in court(s) in other jurisdictions including in the State of South Carolina.  *Id.*  By making out knowingly false affidavits intended to be filed to intentionally mislead courts and government agents such as a Florida Notary Public, there can be no more of an exemplary case in the law of intentional defamation and related claims for intentional harm for which Defendants must appear in Court to answer for their intentional wrongs and to be punished for their attempts to not only defame the Plaintiff but to subvert the very systems of society in which reliable and truthful sworn affidavits are essential to all adjudicatory processes.  Indeed, the South Carolina Supreme Court has recognized: "This Court is shocked by respondent's

abuse of the office of notary public. A notary is a public officer, who, by his hand and seal, authenticates certain classes of documents. See Code §§ 26-1-10 *et seq.* (1976); 66 C.J.S. Notaries § 1, *et seq.* *The credibility of notarized documents is essential to the viability of our legal system*...The affidavits prepared and falsely authenticated by respondent were null and void."). *Matter of McGuinn*, 272 S.C. 366 (S.C. 1979) (*per curiam*). This Federal Court should take guidance from the wisdom and holding announced in the *Matter of McGuinn* case and instruct the jury to award punitive damages to the highest possible level under Florida law. This case should stand a strong beacon to the citizens of Florida that while defamation per se will not be tolerated, attempted subversion of our legal systems through knowingly false and notarized affidavits will be met with severe sanctions and punitive damages.

3.      Despite making out their knowingly false statements accusing Plaintiff, *inter alia,* of child abuse and otherwise, Defendants provided no details pertaining to the who, what, when and where of such abuse in their affidavits and now they must come before this Court to back up their knowingly false statements—which they will be unable to do. Plaintiff has suffered and is suffering awful and terrible harm including, and not limited to, egregious mental suffering from Defendants' actions and has commenced this lawsuit to set the record straight, to protect courts in the Union from false claims made in knowingly false affidavits aimed at subverting justice and to compensate Plaintiff for his injuries to date and those

4

which he will suffer hence, and to punish Defendants through significant punitive damages so that they and others are deterred from making similar false claims of domestic abuse and, especially, child abuse divorced from fact and law.

4.      Each of the Defendants stated under oath and before a notary public, and *in haec verba* and in their own respective Affidavits that: "I have known Erik Cherdak for many years...He...has abused my daughter and grandsons...[in] an attempt to continue to hurt my daughter and grandchildren." *See* Exhibits 1 and 2 at ¶¶ 12, respectively (Sworn Affidavits of Defendants Vincent Paul Cottone and Linda Marie Cottone, respectively).[2]   Nothing could be further from the truth and Defendants certainly knew better before they engaged in their acts of defamation

---

[2] Although there is no question that Plaintiffs published their sworn affidavits containing their knowingly false and defamatory statements containing libel *per se* outside of any court proceeding, Plaintiff has been informed by an attorney Jonathan E. B. Lewis (not licensed to practice law in Florida) that Defendants' sworn affidavits have not yet been filed in any court proceeding—and he and the Defendants are advised that such affidavits should not be further published in any context. *See* Exhibit 3 (Email from Mr. Lewis to Plaintiff dated September 22, 2022, Mr. Lewis stating: "[P]lease find affidavits not yet provided to the Court in Maryland or Charleston from [Vincent] Paul [Cottone] and Linda Cottone..."). Defendants should be exercising their best efforts on notice of this Complaint (sent in courtesy copies on Monday, September 26, 2022—as Florida does not permit transmittals for purposes of service on Sundays—in an abundance of caution, Plaintiff sent his materials to the Defendants at their last known email addresses as specified in the caption of this Complaint). To speed the filing of this Complaint so as to attempt to head off any further wrongful publication by the Defendants and their proxies, Plaintiff has filed a redacted, public version of Exhibits 1 and 2 and will be seeking a sealing order in due course along with an application for a preliminary injunction to stop any further publication in accordance Fed. R. Civ. P. Rule 65. Just to be clear, to date, Plaintiff is aware of numerous acts of publication of Defendants' Sworn Affidavits both directly and through proxies in and outside of Florida and, in particular, to particular persons including, and very likely not limited to, notary publics in Florida (Mr. Danillo Morales), Mr. Jonathan E.B. Lewis of Beaufort, South Carolina, Mrs. Lauren Ann Cottone, and Mr. Christian St. Amour (an independent contractor to Plaintiff in the legal services field). Plaintiff asserts those names to demonstrate acts of wrongful publication of Defendants' affidavits as required under elements of defamation.

*per se*, and in particular, their sworn libel *per se*.[3]  Defendants must be called to testify before a jury of their peers to explain in detail, their knowingly false claims of domestic abuse of Plaintiff's spouse and of Plaintiff's two sons and all other grandchildren of the Defendants and, in particular, Defendants must be called to the witness stand to specify the details pertaining to the "when, who, what, where, and how" of the facts and circumstances demonstrating such "abuse" of their daughter, child abuse of all of Defendants' grandchildren *inter alia* and especially of Defendants' grandsons (Plaintiff's sons) and all other grandchildren encompassed by Defendants' egregious, false and libelous statements *per se*.[4]

---

[3] In nearly 30 years of law practice, Plaintiff has never seen or witnessed defendants  make out knowingly false and defamatory claims in sworn affidavits as the Defendants have done in this case.  Defendants' affidavits are self-authenticating, admissible documents demonstrating egregious and outrageous wrongs committed by the Defendants to defame and harm the Plaintiff.

[4] In Defendants' affidavits attached hereto in Exhibits 1 and 2, Defendants' defamatory statements *per se* are broad, sweeping statements that Plaintiff committed child abuse of all of Defendants' grandchildren, namely, Harrison Morgan Cottone Cherdak, Charles Anthony Cottone Cherdak, Emily Lynch (fathered by now-deceased Mr. Michael Lynch), and Olivia Lynch (fathered by now-deceased Mr. Michael Lynch).  All such persons are over the age of 18 and may be specifically named herein publicly and they will be deposed in the normal course.  Additionally, it is noted that Defendants actually stated to Plaintiff that Mr. Lynch was an abusive alcoholic who abused his children—he never did such horrible things as Defendant Linda Cottone alleged,  but he did fall prey to systemic "parental alienation" causing him to suffer unbearable depression ultimately leading to his sad death.  *See* Article entitled, "Whether direct or indirect, parental alienation harms families," November 4, 2019, published by Colorado State University, Department of Psychology, also published in the respected scholarly journal ScienceDaily, Authors unspecified); see also, Exhibit 4, Scholarship Article entitled "Gender Differences in the Use of Parental Alienating Behaviors," Published in the respected Journal of Family Violence (35-5) (DOI 10.1007/s10896-019-00097-5) July, 2020 and also published by Springer Science+Business Media, LLC, part of Springer Nature on September 6, 2019 , by J.J. Harman et al. (From Abstract to demonstrate significant relevance of cited scholarship to legal proceedings such as in the instant case wherein Defendants and others in concert and combination with them are engaged in nothing less than "indirect parental alienation"—the authors stating: "We investigated a specific form of aggression: parental alienating behaviors. Parents who alienate their children from

another parent utilize both direct and indirect forms of aggression. We examined whether there are gender differences in the use of these behaviors by analyzing data from two samples: interviews with parents who have been the target of parental alienating behaviors, and family law appellate court rulings in which parental alienation was found." Relative to the "parental alienation" suffered by Mr. Lynch, Plaintiff recalls one specific incidence in his vacation home in Delaware in July-August, 2003 wherein Defendant Linda Cottone, demanded that their daughter, Ms. Lauren Ann Cottone and Plaintiff (married at the time), immediately "stop talking to Michael [Lynch], I hope he dies." Plaintiff's daughter, Lauren Anne Cottone, was also witness to her mother's terrible comments and acts of parental alienation targeted at Mr. Michael P. Lynch. Plaintiff appears to be getting the same treatment as experienced by Mr. Lynch as Defendants have falsely accused Plaintiff of similar conduct and abuse so as to engage in a campaign of very dangerous alienation. In the case of Mr. Lynch, Defendant Linda Cottone expressly orchestrated a plan of alienation involving knowingly false allegations about Mr. Lynch including abuse of his beloved two little girls prior to his unfortunate death. In the case of the Plaintiff, Defendants have not been in the presence of the Plaintiff for many years and are just now defaming him per se by claiming that, like Mr. Lynch, Plaintiff engaged in domestic abuse and, shockingly, in child abuse. Suffice it to say, Plaintiff remained in-touch with Mr. Lynch up until shortly before he died—he suffered extreme and outrageous despair brought on by the parental alienation targeted against him. *See id.* at Article, pg. 1 (" Direct verbal and physical aggression include behaviors such as verbal or physical threats and/or assault. Indirect aggression, on the other hand, involves circuitous approaches aimed to socially manipulate and harm the target, and includes such behaviors as gossiping, social exclusion, *and any other attempts to lower the target's social standing*.") (internal citations omitted). *See also*, "Allegations of Family Violence in Court: How Parental Alienation Affects Judicial Outcomes," Published by the respected American Psychological Association, Copyright 2020, J.J. Harman, et al. (Department of Psychology, Colorado State University; and PsychLaw.net, Ann Arbor, Michigan), stating, inter alia, that:

> PA [parental alienation] is an outcome of what some scholars have considered a form of family violence (Harman et al., 2018) that is characterized by the perpetration of parental alienating behaviors by an alienating parent (e.g., derogating the alienated parent; Baker & Darnall, 2006; Harman & Matthewson, 2020). Parental alienating behaviors are very harmful to children and their extended family members (Dijkstra, 2019; Harman et al., 2018; von Boch-Galhau, 2018), which has led to a call for action for more research and interventions that employ a child protection response to the problem (Harman et al., 2018; Kruk, 2018).

Defendants conduct is nothing less than parental-type alienation that has caused great harm to Plaintiff and other extended family members. Defendants conduct represents parental alienation type behavior of the worst kind aimed and targeted at alienating Plaintiff from his own sons. Accusing Plaintiff of domestic abuse and child abuse is violent conduct by the Defendants specifically aimed at lowering Plaintiff's standing as a father to his sons and now the Defendants will be called to answer for their wrongs. Worse yet, Defendants conduct to engage in making knowingly false and defamatory allegations of child abuse targeted at Plaintiff are, in and of themselves, acts of horrendous family violence that can and will very likely scar Plaintiff's sons for the rest of their lives. *Id.* To falsely call out a loving father as being a "child abuser" is absolutely damaging to so many people such that Defendants must be punished through

7

Defendants' sworn and notarized affidavits in Exhibits 1 and 2 do not contain any details or facts pertaining to the alleged domestic abuse and child abuse alleged to have been done by the Plaintiff to children—because nothing could be further from the truth. Plaintiff has not been in the presence of the Defendants since May, 2019, when Plaintiff hosted the Defendants and many others in Washington, DC in celebration of Plaintiff's oldest son graduating from high school. Defendant has not spoken with his sons (Defendants' grandsons) in nearly a year and his estranged wife in over one year. Defendants have accused the Plaintiff of child abuse unlawfully and the record must be corrected and, especially, through the

---

significant punitive damages. Plaintiff is presently in the process of communicating with researchers identified in the articles cited in this footnote, *inter alia*, for purposes of education and to testify as expert witnesses at trial on the merits. It also is noted that an attorney acting in concert with the Defendants by the name of Mr. Jonathan E. B. Lewis very likely prepared the actual affidavits signed by the Defendants. Mr. Lewis was the first to act on behalf of Defendants' daughter, Lauren Ann Cottone, to bring false allegations of domestic abuse on allegations having no basis in fact or law—and which are soon to be litigated in the context of a motion for sanctions to be heard in the Family Court in Charleston, South Carolina. Mr. Lewis very likely counseled Defendants to make out their defamatory affidavits that go far beyond alleging facts normally associated with the general notion of a "fact based affidavit" (of which Defendants are not factual but which, instead, are damning, sworn testaments calling out knowingly false legal conclusions of domestic abuse and child abuse). If Mr. Lewis, as an unlicensed Florida attorney, failed to properly inform Defendants that their statements were not ones of fact but of legal conclusions consistent with Florida law, *See* Florida Statutes (2018) at Title XLVI, Chapter 827, Abuse of Children at § 827.03(1)(2) (Def. of Child Abuse), *et. seq.* (including punishments and classifications as felonious), then Mr. Lewis could very likely be named as a cross-defendant by the Defendants in this case. In no event, however, should a claim of ignorance of the law or alleged reliance on a lawyer's bad advice be the bases of defenses in this action—they are simply not. *See* United States District Court for the Middle District of Florida (February 10, 2022) at Section 4 ("Rules Everyone Must Follow") ("The saying 'Ignorance of the law is no excuse' is true here." Regardless of whether Mr. Lewis is named as a cross-defendant or in any other way in this case, such procedural aspects that may occur in this case do not limit, or inhibit, or otherwise act against Plaintiff in his right to apply for and to obtain a due and proper injunction against the Defendants to stop them from further engaging in nefarious and intentional acts to public knowingly false claims inter alia of child abuse by the Plaintiff.

Defendants being called to this Court's witness stand to account for their intentional torts, damaging claims, and heinous accusations of abuse and child abuse they made in their sworn statements without any facts to support their claims and certainly not based on inadmissible, fallacious hearsay. Defendants will be able to come forward with any hard evidence and real facts to demonstrate their knowingly false and defamatory statements. Defendants' have intentionally set out to harm and cause outrageous and unbearable mental, physical pain in Plaintiff by engaging in libel *per se* while doing so maliciously, deliberately, and without any good cause. Plaintiff will be able to demonstrate to the finder of fact that he is a loving father who had to say no to extensive drug use, drug paraphernalia sales and distribution, numerous instances of drug related law enforcement involvement, defense of numerous claims and accusations of educational misconduct including, domestic violence without Plaintiff's involvement that brought on law enforcement due to physical fights between Defendants'' daughter and Defendants' grandsons while Plaintiff was not even home, the requirement for hospitalization and emergent mental health evaluations and interventions when Defendants' grandsons were physically violent and destructive to Plaintiff's home after construction was done in the home. Plaintiff will be able to show horrendous disrespect by Defendants' daughter, and his sons resulting in things they wrote that never should have been uttered. Plaintiff will also be seeking discovery of extended family members who will attest to the fact

that Plaintiff has never engaged in abuse of Defendants' four grandchildren as contemplated in their Affidavits, and that Defendants have a history of engaging in terribly, disrespectful discords actually witnessed by Plaintiff and/or both of Defendants' daughters who suffered the effects of terrible and an inappropriate "fighting" in front of and directed to their own children. Plaintiff will present facts that Linda and Vincent Cottone engaged in horrendous threats of terrible treatment toward each other (as directly witnessed by their daughter and Plaintiff (then married with newborn at the time) that included statements from Defendant Linda Cottone threatening Defendant Vincent Cottone by exclaiming with a knife in her hands and in front of Defendants' grandson, Harrison, that "if you don't shut your fucking mouth Vinny, I'm going to stab you!" Plaintiff will further show that Defendants' daughter has engaged in conduct that is shocking – such as by acting with her friends to make out knowingly false police reports claiming abuse and harassment which have all been investigated by law enforcement or courts and found to be flat-out lies.

5.    Because Defendants made their knowingly false and defamatory statements alleging that Plaintiff has abused their daughter, Lauren Ann Cottone, and all four of the Defendants' grandchildren in writing, in sworn affidavits while under oath stated before a Florida notary public, Defendants have committed defamation *per se* and, in particular, libel *per se* thereby negating any need or requirement of the plaintiff to plead or prove special or particular damages. Indeed, the nature of

Defendants' knowingly false and defamatory statements are so outrageous, so egregious, and absolutely unfounded is so shocking that Defendants' malice is presumed as are generalized damages. Falsely accusing a person, *inter alia*, of child abuse is so egregious and is a claim of one of the most heinous actions any person can commit—the spoliation of a child. When knowingly false claims of child abuse are made, the speaker or writer (here, the Defendants) must account for, pay up significant damages, and be punished to the fullest extent of the law.

6.     Indeed, in Florida and in all places throughout the Union, claims of child abuse must ordinarily be taken seriously and must be placed under scrutiny and investigation and vetted to get to the *truth or falsity* of the matters asserted as child abuse in and of itself as a crime (and one of moral turpitude) punishable as a felony and incarceration—Defendants, being citizens of the State of Florida, are held to know the law of this State and the ramifications of their knowingly false claims literally asserting that Plaintiff has engaged in abuse of children including Defendants' grandsons and all of Defendants grandchildren (four children in total, namely, Harrison, Charles, Emily and Olivia—now spanning ages 19-25). *See* Florida Statutes (2018) at Title XLVI, Chapter 827, Abuse of Children at § 827.03(1)(2) (Def. of Child Abuse). Defendants statements were knowingly false because no such abuse (generally or specifically as to child abuse) ever occurred. The Defendants' accusations of child abuse were knowingly false and in the State of Florida represent presumed malicious acts to defame the Plaintiff, to paint

Plaintiff in a false light in clear invasion of his privacy, and were done to advance __no__ rightful or genuine cause.  Again, "[t]he significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occureence [sic] of damage are both presumed from the nature of the defamation." *Wolfson v. Kirk* , 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973).

7.      To be crystal clear, Defendants affidavits in Exhibits 1 and 2 are silent as to any facts related to any "abuse" of their daughter, Lauren Ann Cottone, and of "abuse" of all four of the Defendants' grandchildren including the Plaintiff's own sons.  The Defendants are to be held liable for their own intentional torts herein and that the law requires this Court to presume to have been done with malice (given the nature of the claims—*i.e.,* that of domestic abuse and of child abuse) for which general damages are also presumed and need not be pleaded in the State of Florida and elsewhere in throughout the Union as expressed in numerous precedents. *See, for example,  Miller v. Watkins*, No. 02-20-00165-CV, at \*29 (Tex. App. Mar. 11, 2021) ("Relevant to the facts we analyze, an accusation of child abuse is an accusation of a crime and—to use outdated parlance—defamatory *per se*.") (*Aff'd in part, rev'd in part on other grounds in Lozano v. Lozano*, 983 S.W.2d 787, 793(Tex. App.—Houston [14th Dist.] 1998), 52 S.W.3d 141 (Tex. 2001)); *see also, Humphries v. County of Los Angeles*, 554 F.3d 1170, 1186 (9th Cir. 2008) ("Indeed, to be accused of child abuse may be our generation's contribution to defamation per

se, a kind of moral leprosy."); *see also Williamson v. Dig. Risk, LLC*, Case No: 6:18-cv-767-Orl-31EJK, at *11-12 (M.D. Fla. Jan. 28, 2020) ("Under Florida law, statements can be defamatory per se.") (citing *Hoch v. Rissman*, 742 So. 2d 451, 457 (Fla. 5th DCA 1999)). A statement is defamatory per se, "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime[5]; (2) it charges a person with having an infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; *or* (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA); *see also, Wolfson v. Kirk*, 273 So.2d 774, 776 (Fla. 4th DCA 1973) ("The law at an early time recognized a distinction between defamations 'per se' and defamations 'per quod.' The reason underlying the distinction is that some statements are so obviously defamatory, that is damaging to reputation, that the mere publication of them gives rise to an *absolute presumption both of malice and damage*.").[6] Defendants' statements asserting abuse to their daughter, Lauren

---

[5] Without question, under Florida law, Defendants have falsely accused and falsely asserted that Plaintiff has committed infamous crimes of domestic abuse and child abuse all otherwise punishable, if they were true (and they are not in this case), as felonies and punishable by incarceration. *See* Florida Statutes (2018) at Title XLVI, Chapter 827, Abuse of Children at § 827.03(1)(2) (Def. of Child Abuse), et. seq. (including punishments and classifications as felonious).

[6] In yet another affidavit allegedly signed by Plaintiff's oldest son, Harrison, to testify against Plaintiff at the request of the Defendants' daughter, Lauren Ann Cottone, in divorce-type litigation in the Family Court in Charleston, South Carolina, Plaintiff's son does not mention any abuse of himself or of himself of any kind to anybody. Defendants now stand alone with their actionable *per se* defamatory statements and Plaintiff seeks his day in court to have Defendants answer for their intentional torts and wrongs and, as

Ann Cottone, and child abuse as to Defendants' "grandsons" and "grandchildren" more generally are statements that are defamatory *per se* in Florida and hence this Court must presume both malice on the part of both Defendants and general damages due to the Plaintiff. Indeed, even if a jury were to grant a dollar as nominal damages in this case, the jury would be free to grant any amount of additional punitive damages to both punish the Defendants and to set out an exemplary deterrent that making false claims of abuse and child abuse in Florida will not be tolerated.

8. In the following sections of this Complaint, Plaintiff specifies the real parties in interest to the extent known at the time of this case's commencement in the Court, lays out required jurisdictional, venue and other factual predicates necessary for this case to proceed in this Court and in the normal course and

---

importantly, to set the record straight. Defendants will be wholly unable to call their four grandchildren and their daughters to any witness stand to testify truthfully under oath that Plaintiff abused anybody—it just did not happen and in no way has Plaintiff abused his family members and especially not his children or the grandchildren of borne to Defendants' other daughter, Ms. Dina Finos (formerly Ms. Dina Lynch—*see also*, Footnote No. 4 for additional sub-text and discussion related to acts of alienation suffered by Ms. Dina Finos' former, now deceased, ex-husband who was put through a series of alienating actions that very likely at least played a part in his sad demise and death—in fact, Plaintiff will be able to recant a situation in 2003 wherein Defendant Linda Cottone demanded that neither Plaintiff, Plaintiff's wife (Ms. Lauren A. Cottone) and Ms. Finos to "stop talking to Michael [Lynch], I hope he dies."). Suffice it to say that Plaintiff did not succumb to such acts to alienate Mr. Lynch and Plaintiff remained in touch with Michael until weeks before his unfortunate death. Familial alienation of targeted individuals is one of the most heinous acts that is aggravated and exacerbated when it is done as to one parent by other family members and involves degradation of the relation between children of the targeted/alienated parent and his or her children.).

pursuant to both the Federal Rules of Civil Procedure and this Court's Local Rules and any Orders the Court may issue in the interest of full, fair and economical adjudication of the merits. Plaintiff will likely be seeking summary judgment after service of process of this Complaint and a Summons to be issued by the Court. Plaintiff anticipates very little discovery as the evidence of Defendants' compensable and punishable acts has been perfected and produced by the Defendants themselves — in their own sworn affidavits contained in Exhibits 1 and 2. Defendants can claim no defenses as they do not have any countervailing facts on their side nor any privileges or immunities to assert by way of law. Defendants have brought this case on by their own actions, wrongful and compensable conduct, and libel *per se* presumed under Florida law to have been done with malice aforethought and to have injured and harmed the Plaintiff *ipso facto* and through no provocation by Plaintiff and amidst terrible treatment of the Plaintiff by his family. Defendants will not be able to point to any evidence of abuse of any kind and, as such, Defendants should be found by a jury to be intentional tortfeasors who acted in absolutely morally reprehensible ways (and who sought to use their affidavits to dupe court(s) on false claims that Plaintiff has abused Defendants' daughter and the Defendants' grandchildren. This action will set the record straight against tortfeasors who knowingly, intentionally, and with presumed malice aforethought set out to target and harm the Plaintiff in violation of law.

## PARTIES

9.     Plaintiff, an individual moving pro se at the time of commencement of the instant case, is a citizen and resident of the State of Maryland residing at 149 Thurgood Street, Gaithersburg, Maryland 20878, Ph. 202.330.1994, email: ebcme@me.com.

9.     Defendant Vincent Paul Cottone is an individual and citizen and resident of the State of Florida residing at 28038 Foxrock Court, Bonita Springs, Florida (Lee County), 34135-9137, last known email address: vpcott@comcast.net

10.    Defendant Linda Marie Cottone, married spouse of and to Defendant Vincent Paul Cottone, is an individual and citizen and resident of the State of Florida residing at 28038 Foxrock Court, Bonita Springs, Florida (Lee County), 34135-9137, last known email address: lmcott@comcast.net.

## JURISDICTION AND VENUE

11.    Jurisdiction is to be concluded and found by this Court under 28 USC § 1332. There is complete diversity of citizenship among the Plaintiff and the Defendants and the amount in controversy far exceeds all jurisdictional limits and is over $75,000.00 exclusive of interest and costs of suit and also of liability associated with Plaintiff' application for injunctive relief as prayed for herein. Plaintiff will soon be filing a motion for Preliminary Injunction seeking to stop Defendants from

16

additionally publishing their knowingly false and defamatory statements to harm the Plaintiff.  Plaintiff will also likely pursue summary judgment as Defendants must be brought to justice.

12.    Venue is proper as all Defendants are Florida residents and located within Bonita Springs in Lee County, Florida.  Moreover, the causes of action occurred and accrued in Florida as evidenced by facts not the least of which including that Defendants' made their knowingly false and defamatory statements, acted in furtherance of their conspiracy to harm the Plaintiff and to have their damning affidavits in Exhibits 1 and 2 notarized while presenting themselves to stand before Florida commissioned Notaries Public.  Additionally, the Defendants are proximately close to this U.S. District Court for the Middle District of Florida. Defendants cannot claim inconvenience in relation to the instant case being litigated in this Court and in relation to this Court properly exercising all due and proper jurisdiction in this diversity-of-citizenship action as presently pleaded and in accordance with 28 USC § 1332.

### PLAINTIFF'S CLAIMS AND CAUSES OF ACTION IN VIEW OF THE FACTS PRESENTED HEREIN

#### A. Defamation *per se*

13.    Plaintiff hereby incorporates by reference all of the allegations of all prior sections and the points stated therein as if repeated now in their entirety.  Plaintiff additionally alleges:

14.     Under Florida law, the elements of a defamation claim are: (1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the falsity of the statement caused injury to the plaintiff.  *See Border Collie Rescue v. Ryan*, 418 F.Supp.2d 1330, 1348 (M.D.Fla. 2006).   In certain cases such as in the instant case where the statements involve accusations of committing crimes, inter alia, under Florida law, defamation and its contemplated form of written (or libelous) defamation is actionable per se.  "The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occureence [sic] of damage are both presumed from the nature of the defamation." *Wolfson v. Kirk ,* 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973).  *see also, id at 776* ("The law at an early time recognized a distinction between defamations 'per se' and defamations 'per quod.' The reason underlying the distinction is that some statements are so obviously defamatory, that is damaging to reputation, that the mere publication of them gives rise to an *absolute presumption both of malice and damage.*").  In Florida, a statement is defamatory *per se,* "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime[7]; (2) it charges a person with having an

_____

[7] Without question, under Florida law, Defendants have falsely accused and falsely asserted that Plaintiff has committed infamous crimes of domestic abuse and child abuse all punishable, if true, as felonies and incarceration. *See* Florida Statutes (2018) at Title XLVI, Chapter 827, Abuse of Children at § 827.03(1)(2) (Def. of Child Abuse), *et. seq.* (including punishments and classifications as felonious).

infectious disease; (3) it tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; *or* (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli,* 182 So. 3d 881, 884 (Fla. 4th DCA).  When a plaintiff proves up defamation *per se* by defamatory statements made by a defendant, the plaintiff is not required to show damage to reputation or otherwise—the defamatory statements in and of themselves automatically impute presumptions of malice aforethought as to the defendant's defamatory statements and injury compensable through general damages owed to the plaintiff. *Id.*

15.     Each of the Defendants published false statements directly conveying the knowingly false and defamatory statements that Plaintiff (Erik B. Cherdak) "has abused my daughter and grandsons…[in] an attempt to continue to hurt my daughter and grandchildren."). *See* Exhibits 1 and 2 at ¶¶ 12, respectively (Sworn Affidavits of Defendants Vincent Paul Cottone and Linda Marie Cottone). Nothing could be further from the truth. Each of the Defendants acted maliciously, at least wantonly and with reckless disregard to the truth of the matters they asserted *in haec verba,* and certainly negligently and grossly negligently by failing to adhere to reasonable norms and duties to avoid defaming others and, as members of an organized society, to measure their respective written words and certainly not to accuse an innocent person, Plaintiff, of abuse of any kind and

certainly not of any kind of abuse related to child abuse when Defendants knew that there was never any such abuse in the first instance. Each of the Defendants knew that their statements were false when they were made. Each Defendant acted with actual malice to harm, reckless and wanton abandon and without any care for the harm (both physical and mental that they caused the Plaintiff by their intentionally wrongful and tortious conduct). Defendants acted alone and in concerted and intended conspiratorial combination to harm Plaintiff. Each of the Defendants had their own duty to not defame and make knowingly false statements that were aimed at harming and painting Plaintiff in a false light without any basis in fact. In fact, Defendants' affidavits do not contain any facts supporting any legitimate claim of abuse of any kind. Each of the Defendants equally had a duty to not defame Plaintiff (such as by their libel *per se*), in particular, through their knowingly false statements alleging to be "facts" when they actually asserted fallacious and harmful comments targeting Plaintiff and intending to cause him great pain and suffering. Due to and but for their breaches of their duties to not defame Plaintiff, Plaintiff would not be suffering the harm caused by Defendants' intentional tortious conduct clearly aimed at harming the Plaintiff.

16.     Plaintiff statements in their affidavits directly reference, name and are solely directed to alleged domestic abuse and child abuse by the Plaintiff. *See* Exhibits 1 and 2 at ¶¶ 12, respectively (Defendants each stating under oath and before a

notary public in Florida that Plaintiff (Erik B. Cherdak) "has abused my daughter and grandsons...[in] an attempt to continue to hurt my daughter and grandchildren.").

17. Each of the Defendants published their statements to third parties. At least prior to discovery, it is known that Defendants published their affidavits and all statements and defamatory statements either directly or by instruction through intermediaries to Mr. Jonathan E.B. Lewis, Notary Public Danilo Morales, and Ms. Linda Adkins Lewis and a Mr. Christian St. Amour. Mr. Christian St. Amour is a business service provider to Plaintiff in Plaintiff's field of work in the legal profession and otherwise. Shortly after noon on Monday, September 26, 2022, Mr. St. Amour telephoned Plaintiff and commented on the nature of the affidavits sent and published to him by Defendants acting through a South Carolina proxy by the name of Jonathan E. B. Lewis, namely the PDF versions of the Defendants' affidavits in Exhibits 1 and 2. Mr. St. Amour is attending to an assignment by Plaintiff to retrieve all papers that may have been recently filed in the South Carolina Family Court in Charleston, South Carolina to begin to gather a understanding of the full scope of publication that Defendants have intended and actually effectuated. If Defendants attempt to assert some litigation type privilege for filing documents in a court, they will meet a brick wall on such a claim—there is no privilege to defame a private party like the Plaintiff and our courts do not condone inequitable use of judicial process to hide behind intentional torts and

other wrongs.  If Mr. Lewis counseled Defendants as a non-Florida lawyer, then he certainly failed to advise Defendants' of the consequences of engaging in intentional defamation per se and the improper attempts to dupe courts though knowingly false claims made in sworn affidavits in any context.

18.    Each of Defendants' defamatory statements, in their own right and in *haec verba* asserts that Plaintiff engaged in criminal activity, namely, child and other abuse under Florida law punishable as felonious criminal conduct warranting incarceration.  *See* Florida Statutes (2018) at Title XLVI, Chapter 827, Abuse of Children at § 827.03(1)(2) (Def. of Child Abuse), *et. seq.* (including punishments and classifications as felonious).

19.    In Florida, a statement amounts to defamation *per se* if it accuses the plaintiff of committing a crime or imputes to the plaintiff conduct, characteristics, or a condition incompatible with the proper exercise of his or her lawful business, trade, profession, or office.  See *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA) (quoted supra).  Each of Defendant's false and defamatory statements *at least* accuses Plaintiff of committing crimes of moral turpitude namely abuse and child abuse of family members that are not true.   And, because Defendants statements are so broad, they also and implicates accusations of mental abuse, physical abuse, sexual abuse and in all ways that may be contemplated under Florida law (cited *supra*).  Such additional defamation by implication is treated *infra* in relation to Plaintiff's claim and cause of action for the same—and, in

particular, with reference to the facts that (1) Defendants' affidavits contain knowingly false and defamatory statements that are egregiously broad in nature; and (2) Defendants knowingly false and defamatory statements are subject to multiple heinous interpretations regarding the degrees to which there has been accused and alleged domestic abuse and child abuse.  *See* Exhibits 1 and 2 at ¶¶ 12, respectively.

20.    Defendants' knowingly false and defamatory statements that Plaintiff engaged *inter alia* in abuse of children constitutes express libel *per se* and are actionable as such.  *See for example  Miller v. Watkins,* No. 02-20-00165-CV, at *29 (Tex. App. Mar. 11, 2021) (Relevant to the facts we analyze, an accusation of child abuse is an accusation of a crime and—to use outdated parlance—defamatory *per se. See  Lozano  v. Lozano,* 983 S.W.2d 787, 793(Tex.  App.—Houston [14th Dist.] 1998), *aff'd in part, rev'd in part on other grounds,* 52 S.W.3d 141 (Tex. 2001)); *see also, Humphries v. County of Los Angeles,* 554 F.3d 1170, 1186 (9th Cir. 2008) (" Indeed, to be accused of child abuse may be our generation's contribution to defamation per se, a kind of moral leprosy."); *see also Williamson v. Dig. Risk, LLC,* Case No: 6:18-cv-767-Orl-31EJK, at *11-12 (M.D. Fla. Jan. 28, 2020) ("Under Florida law, statements can be defamatory per se. *See Hoch v. Rissman,* 742 So. 2d 451, 457 (Fla. 5th DCA 1999). A statement is defamatory *per se,* "if, when considered alone without innuendo: (1) it charges that a person has committed an infamous crime; (2) it charges a person with having an infectious disease; (3) it tends to subject one

to hatred, distrust, ridicule, contempt, or disgrace; or (4) it tends to injure one in his trade or profession." *Blake v. Giustibelli*, 182 So. 3d 881, 884 (Fla. 4th DCA) (internal quotations and citations omitted). In other words, the statements are "so obviously defamatory" and "damaging to [one's] reputation" that they "give[ ] rise to an absolute presumption both of malice and damage." *Wolfson v. Kirk*, 273 So.2d 774, 776 (Fla. 4th DCA 1973); *see Campbell v. Jacksonville Kennel Club, Inc.*, 66 So.2d 495, 497 (Fla. 1953).”); *see also, Echols v. Lawton*, 913 F.3d 1313, 1321 (11th Cir. 2019) (“Libel *per se* includes "falsely stat[ing] ... that a person has a criminal case pending against him." *Harcrow* , 511 S.E.2d at 546 ; *Witham v. Atlanta Journal* , 124 Ga. 688, 53 S.E. 105, 107 (1906) (explaining that a statement that "in effect charges that there are criminal cases pending against [the plaintiff]" is libel *per se* (internal quotation marks omitted)); *see also Cottrell* , 788 S.E.2d at 780–81 (explaining that a false statement imputing a crime to the plaintiff is libel *per se* ). To establish libel *per se* , the statement "must charge the commission of a specific crime punishable by law" by "giv[ing] the impression that the crime is actually being charged against the individual." *Cottrell* , 788 S.E.2d at 781.”); see also, *Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1274-75 (S.D. Fla. 2020) (“A written publication constitutes libel per se under Florida law if, when considered alone and without innuendo, it *(1) charges that a person has committed an infamous crime*; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." *Alan v. Wells Fargo Bank, N.A.* , 604 F. App'x 863, 865 (11th Cir.

2015) (emphasis added). "The significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the occureence [sic] of damage are both presumed from the nature of the defamation." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973)."); *see also, Earthlink, Inc. v. Log on America, Inc.*, Civil Action No. 1:02-CV-1921-JOF, at *6 (N.D. Ga. June 30, 2006) ("A written defamatory statement is actionable as either libel per se or libel per quod. Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality. Statements that tend to injure one in his trade or business also are libelous per se. Defamatory words which are actionable per se are those which are recognized as injurious on their face — without the aid of extrinsic proof. However, if the defamatory character of the words [does] not appear on their face but only become defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod, and are said to require innuendo."); *see also, Lawnwood Medical Center, v. Sadow*, 43 So. 3d 710, 712 (Fla. Dist. Ct. App. 2010) ("In separate proceedings on the slander per se claim, the jury found Lawnwood liable for the slanders; that Lawnwood specifically intended to harm him by its per se slanderous statements; that, in fact, it had actually injured him by the statements; and that he suffered no compensatory damages from the slanders but that he was entitled to punitive damages of $5 million from the hospital. After extensive hearings, the trial court denied Lawnwood's post-trial

motions for directed verdict and a new trial or a remittitur of punitive damages to a reduced sum."); *see also and as background, Metropolis Co. v. Croasdell*, 145 Fla. 455, 457-58 (Fla. 1941) ("The third question presented is whether or not there was evidence of actual malice in the record. Words amounting to libel *per se* necessarily import malice. *Layne v. Tribune Co., supra; Johnson v. Finance Acceptance Co. of Georgia*, 118 Fla. 397, 159 So. 364. General damages for the use of words defamatory *per se* need not be proved. *Piplack v. Mueller*, 97 Fla. 440, 121. So. 459; *Layne v. Tribune Co., supra; Commander v. Pedersen*, 116 Fla. 148, 156 So. 337; *Johnson v. Finance Acceptance Co. of Georgia, supra; Harriss v. Metropolis Co.*, 118 Fla. 825, 160 So. 205. "The evidence adduced by the plaintiff, if believed by the jury, was ample to support a verdict, and, coupled with the failure of the defendant to print a retraction within ten days after receipt of notice as required by Chapter 16070, Acts of 1933, would be some evidence of actual malice on the part of the defendant. See 37 C. J. 78, Sec. 484, and note, *Augusta Chronicle Publ. Co. v. Arrington*, 42 Ga. App. 746, 157 S.E. 394.").

21.    Although Plaintiff need not plead or be required to prove actual damages resulting proximately or otherwise from Defendants' knowingly false defamatory statements *per se*, it goes without saying that falsely accusing a loving father of child abuse is a wrong, painful, and intentionally harmful thing that simply goes too far in civilized society.  Defendants accusations and false and conclusory statements that Plaintiff engaged in abuse and, more particularly, child abuse

against all of Defendants' grandchildren have harmed Plaintiff causing sleepless nights, painful and stressful headaches (especially for a stroke survivor like Plaintiff who works hard to manage and minimize stress), body aches, depression and terrible malaise.  Plaintiff has contacted his mental health support team and will be engaging in counseling to support Plaintiff in being falsely accused of child abuse by Defendants.   The level of stress caused to Plaintiff is actionable and compensable independently and in combination with the physical manifestations of that stress (such as painful post-stroke headaches that are wholly debilitating taking Plaintiff away from work and other normal life activities).  Plaintiff has been in touch with his neurologist and has been ordered to increase his stress management medications at least temporarily upon being falsely accused by Defendants of knowingly false and unreasonable accusations of child abuse. Claims of abuse and child abuse have long been known to ruin reputations, bring about criminal prosecution, stigmatization, and unreasonable and shocking and debilitating levels of pain and suffering.  That said, under Florida law, Plaintiff can be awarded nominal or no compensatory damages (although the same are presumed) while still being able to recover significant punitive damages.  See *Lawnwood Medical Center, v. Sadow*, 43 So. 3d 710, 712 (Fla. Dist. Ct. App. 2010) ("In separate proceedings on the slander per se claim, the jury found Lawnwood liable for the slanders; that Lawnwood specifically intended to harm him by its per se slanderous statements; that, in fact, it had actually injured him by the statements;

and that he suffered no compensatory damages from the slanders but that he was entitled to punitive damages of $5 million from the hospital. After extensive hearings, the trial court denied Lawnwood's post trial motions for directed verdict and a new trial or a remittitur of punitive damages to a reduced sum.").

22.    All measures and types of damages are available to the Plaintiff and he is not limited to damage to reputation under Florida law.  Indeed in *Miami Herald Publishing Co. v. Ane*, 458 So. 2d 239, 243 (Fla. 1984) (citing and quoting *Time, Inc. v. Firestone*, 424 U.S. 448, 460, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976)), the Supreme Court of Florida recognized by the *Time* court's note stating: "Petitioner has argued that because respondent withdrew her claim for damages to reputation on the eve of trial, there could be no recovery consistent with *Gertz*. Petitioner's theory seems to be that the only compensable injury in a defamation action is that which may be done to one's reputation, and that claims not predicated upon such injury are by definition not actions for defamation. *But Florida has obviously decided to permit recovery for other injuries without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation. This does not transform the action into something other than an action for defamation as that term is meant in Gertz.* In that opinion we [the U.S. Supreme Court] made it clear that States could base awards on elements other than injury to reputation, specifically listing 'personal humiliation, and mental anguish and suffering' as examples of injuries which might be compensated consistently with the Constitution upon a showing

of fault. Because respondent has decided to forego recovery for injury to her reputation, she is not prevented from obtaining compensation for such other damages that a defamatory falsehood may have caused her." (emphasis supplied). Here, Plaintiff certainly has suffered humiliation, mental anguish and significant pain and suffering by being egregiously and intentionally and falsely labeled, described, and caused to be stigmatized for being an alleged abuser and, more particularly, a child abuser and his injuries are alone and in combination with physical pain and suffering as described herein are compensable under Florida law—that is in Florida, the impact rule has no place in limiting damages when the court adjudicates intentional tort claims such as defamation and libel *per se* and the presumed damages resulting therefrom. *See G4S Secure Solutions USA, Inc. v. Golzar*, 208 So. 3d 204, 208 (Fla. Dist. Ct. App. 2016) ("[O]ur Supreme Court has noted that Florida's <u>impact rule does not apply to any intentional tort such as</u> <u>defamation, invasion of privacy and intentional infliction of emotional</u> <u>distress. *Rowell v. Holt*, 850 So.2d 474, 479 (Fla.2003).").</u>  <u>Accordingly, in this case</u> <u>and in keeping with Florida law, Plaintiff will urge the jury</u> to award no less than $2,000,000 in presumed compensatory damages and at least $6,000,000.00 in punitive damages to punish Defendants and to deter other members of the public from making out sworn statements claiming that a person is a child abuser— probably the single most morally reprehensible conduct about which anybody can be accused and labeled. See also, *Lawnwood Medical Center, v. Sadow*, 43 So. 3d 710,

712 (Fla. Dist. Ct. App. 2010) ("In separate proceedings on the slander per se claim, the jury found Lawnwood liable for the slanders; that Lawnwood specifically intended to harm him by its per se slanderous statements; that, in fact, it had actually injured him by the statements; and that he suffered no compensatory damages from the slanders but that he was entitled to punitive damages of $5 million from the hospital. After extensive hearings, the trial court denied Lawnwood's post trial motions for directed verdict and a new trial or a remittitur of punitive damages to a reduced sum.").[8]

23.    Defendants can point to no privilege, no right to publish their knowingly false and defamatory claims of child abuse, no defense of truth, and no other power to act tortiously under law.  They are liable for their actions and the harms they have caused and also regardless of any damage to reputation or otherwise.

---

[8] Defendants also allege that Plaintiff lied to federal judges, etc. directly going to Plaintiff's reputation.  Regardless of any lower court findings, Plaintiff will be able to demonstrate to this Court for its in-camera review that Plaintiff is a witness in a judicial corruption investigation involving federal judges, etc. There is absolutely no basis in fact for any of the allegations stated by Defendants in relation to immaterial matters that have no relation to this case.  Plaintiff's claims are directed to Defendants' newly minted false and defamatory accusations related to domestic abuse and child abuse and nothing more. Florida law, as set forth herein, does not require demonstration or proof of damage to reputation in order to recover for defamation per se. See, for example, *Miami Herald Publishing Co. v. Ane*, 458 So. 2d 239, 243 (Fla. 1984) (citing and quoting *Time, Inc. v. Firestone*, 424 U.S. 448, 460, 96 S.Ct. 958, 968, 47 L.Ed.2d 154 (1976)) ("Florida has obviously decided to permit recovery for other injuries without regard to measuring the effect the falsehood may have had upon a plaintiff's reputation.") (emphasis supplied).  When Plaintiff has volunteered at prisons to assist the convicted, Plaintiff has been struck that those convicted of child abuse are housed in separate prison wings because even convicted criminals find child abuse and spoliation of a child's mind to be beyond the pale and unacceptable in any context. Defendants' knowingly false and defamatory per se statements that Plaintiff abused Defendants' grandchildren went way too far in terms of being acceptable behavior on any level.  Defendants must be punished by this Court though a proper award of significant punitive damages regardless of any damage to Plaintiff's reputation otherwise caused by the Defendants.

## B. Defamation *by Implication*

### (*Pleaded in the Alternative*)

24.     Plaintiff hereby incorporates by reference all of the allegations of all prior sections and the points stated therein as if repeated now in their entirety.  Plaintiff additionally alleges:

25.     The false statement in Defendants' Exhibits 1 and 2 are objectively false; Plaintiff has never engaged in any abuse and certainly no child abuse of any kind or at any time.  Nonetheless, and for purposes of complete and robust pleading while remaining consistent with the precepts of Rule 8 of the Federal Rules of Civil Procedure, Plaintiff pleads this claim/cause of action for Defamation by Implication recognized under Florida law insofar as if the Court finds and/or concludes as a matter of law that Defendants' false statements stated in Exhibits 1 and 2 are somehow subject to some plausible contention in defense thereof (and they should not be so treated as they are manifestly and objectively false as libel *per se*), the words uttered and written in Defendants' affidavits in Exhibits 1 and 2 are to be read and/or reasonably interpreted in context so as to implicate only defamatory meanings and messages—i.e., such false and defamatory statements imply that Plaintiff is a domestic abuser and a child abuser of all contemplated forms of abuse.  *See Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1100 (Fla. 2008) ("First, we conclude that Florida recognizes a cause of action for defamation by implication. Second, we hold that a communication can be considered

defamatory if it "prejudices" the plaintiff in the eyes of a "substantial and respectable minority of the community," as set forth in comment 'e' of the Restatement (Second) of Torts § 559 (1972)."); *see also, Id,* 997 So. 2d at 1106 ("[I]n *Heekin,* which appears to be the first appellate case in Florida that directly involved a cause of action for false light and discussed the tort in detail, the plaintiff alleged that a broadcast falsely portrayed him as a spouse abuser by juxtaposing an interview with his former spouse along with stories and pictures of women who had been abused and killed by domestic partners. 789 So.2d at 357 ('Heekin's complaint alleged that the specific facts about Heekin contained in the broadcast were true, but that the juxtaposition of these facts with the other stories created the false impression that Heekin had abused and battered his wife and children.')"). So, even if the Court were to conclude that the false allegations in Defendants' affidavits were somehow plausible (and that should be impossible as statements are clearly and objectively not true and not subject to any reasonable interpretation connoting truthful representations), Defendants have at least juxtaposed such allegations of fact by expressly asserting, *inter alia,* that Plaintiff "has abused my daughter and grandsons...[as] merely an attempt to continue to hurt my daughter and grandchildren." *See* Exhibits 1 and 2 at ¶¶ 12, respectively. Again, Plaintiff avers that no implication is needed to reach the plain meaning of Defendants' knowingly false and defamatory statements, but if the Court requires an alternative interpretation to land upon the defamatory meaning and message

communicated by the Defendants' to somehow wrongfully favor them (and the Court should not so act), then Plaintiff has properly pleaded his claim for defamation by implication.

26.     Any reasonable person presented with such (false) factual assertions as contained in Exhibits 1 and 2, would conclude that from such first-person statements made with not a single reference to any supporting facts that Defendant is a domestic abuser of Defendant's daughter, Lauren Ann Cottone, and a child abuser relative to both Defendant's grandsons and all four of Defendants' grandchildren.  In all instances, domestic abusers and child abusers are horrible people who seek to hurt others exactly and literally as asserted and intended to be messaged by Defendants in their affidavits.  *See* Exhibits 1 and 2 at ¶¶ 12, respectively, and, in particular, the language expressly reading as intended to be so read by the Defendants as Plaintiff has in the past and continues to act to "hurt my daughter and grandchildren."  And, as mentioned supra, by placing their statements in written, notarized affidavits, Defendants clearly intended to dupe courts and others and for their knowingly false and defamatory per se statements to cause "maximum negative impact and harm" to the Plaintiff.

27.     In no context will Defendants be able to articulate facts of any kind indicating or otherwise demonstrating that Plaintiff engaged in any abuse of any kind toward any person and especially not towards any child at any time under or in any circumstances.  And, because Defendants distinguished between their

grandsons and their "grandchildren," *see id*, Defendants' statements must be interpreted to mean that Defendants intended to assert that Plaintiff abused his own sons in addition to his God-daughter Olivia, and her sister, Emily as all four persons constitute Defendants' grandchildren.   Plaintiff will be taking the necessary depositions of those four adults all now over 18 years to establish that at no time has Plaintiff engaged in any abuse of them and that their grandparents have perjured themselves terribly in their sworn, testimonial affidavits.

28.   Plaintiff prays for the same damages as set forth in Plaintiff's claim for defamation *per se* as if repeated herein in their entirety, namely for no less than $2,000,000 in compensatory damages and no less than $6,000,000 in punitive damages.

## C. Intentional Infliction of Emotional Distress

29.   Plaintiff hereby incorporates by reference all of the allegations of all prior sections and the points stated therein as if repeated now in their entirety.  Plaintiff additionally alleges:

30.   In *Scelta v. Delicatessen Support Services, Inc.*, 57 F. Supp. 2d 1327, 1357-58 (M.D. Fla. 1999), this Court held that to state a claim for intentional infliction of emotional distress under Florida law, a plaintiff must allege that: (1) Defendants negligently or recklessly inflicted mental suffering, (2) by outrageous conduct, (3) Defendants' conduct must have caused the suffering; and (4) the suffering must have been severe.  (citing and quoting and collecting cases: *see Hart v. United*

States, 894 F.2d 1539, 1548 (11th Cir. 1990); *Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985). In order to satisfy the requirement for outrageous conduct, a plaintiff must allege that the conduct "goes beyond all bounds of decency and [is] regarded as atrocious, and utterly intolerable in a civilized society." *See Metropolitan Life Insurance Co.,* 467 So.2d at 278-79. In Florida, "the issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim for intentional infliction of emotional distress is a legal question . . . for the court to decide as a matter of law." *See Vance v. Southern Bell Telephone Co.,* 983 F.2d 1573, 1575 n. 7 (11th Cir. 1993); *Baker v. Florida Nat'l Bank,* 559 So.2d 284, 287 (Fla. DCA 1990).").  Here, this court cannot question the outrageousness of Defendants' accusations and statements directly (or, alternatively, impliedly) to assert that Plaintiff abused his spouse as a matter of domestic abuse and that Plaintiff abused Defendants' grandchildren including Plaintiff's sons.   Because Defendants placed their knowingly false claims of abuse in written, sworn affidavits, this Court should be very concerned that those affidavits were also intended by Defendants to be used to dupe other courts further aggravating the egregiousness of Defendants' tortious conduct to harm the Plaintiff.   As a matter of law, this Court can only conclude on the facts and written and sworn statements of the Defendants that such statements were extreme and outrageous.   Plaintiff will be seeking appropriate jury instructions with that conclusion of law as a required mandate to be presumed

conclusively by the jury in this case—especially on the jury's determination of punitive damages to be paid by the Defendants.  In an civilized society, no court of law should allow for a second a knowingly false claim that a person is an abuser and, especially, on of a child abusing kind.  Those monikers should only be stated as legal conclusions after due process and certainly not flippantly and aggressively in knowingly false affidavits intended to be used to dupe courts and to bring about unwarranted judicial bias.   *See* Footnote No. 4, *supra* (discussing and citing references and scholarly articles discussing the violent nature of the aggressive nature and effects of comments stated by family members against other family members and the fact that such statements are considered violent acts in and of themselves—this Court and no court should never tolerate unjustified violent behaviors of the kind that are defamatory false statements aimed at bringing about deeply intended alienation of any kind—as already has occurred relative to the relationships Plaintiff enjoyed prior to Defendants intrusive involvement in private family matters in which they had no right to interfere).  And, as an attorney by the name of Mr. Jonathan E.B. Lewis (not licensed in Florida) apparently wrote Defendants' affidavits intended for use in a family court in matters between Plaintiff and Defendant's daughter, Lauren Ann Cottone, this Court is informed as to the importance of affidavits as stated by the South Carolina Supreme Court in *Matter of McGuinn*, 272 S.C. 366 (S.C. 1979) (*per curiam*) ("**This Court is shocked by respondent's abuse of the office of notary public. A notary is a public officer,**

who, by his hand and seal, authenticates certain classes of documents. See Code §§ 26-1-10 *et seq.* (1976); 66 C.J.S. Notaries § 1, *et seq. The credibility of notarized documents is essential to the viability of our legal system*...The affidavits prepared and falsely authenticated by respondent were null and void.") (emphasis supplied).[9]  Exhibits 1 and 2 are affidavits intended by Defendants to

---

[9] Exhibits 1 and 2 are affidavits that were signed, sworn, and notarized and, as such, are intended by Defendants to be used by their daughter, Lauren Ann Cottone, in a Family Court matter now pending in South Carolina between Plaintiff and Lauren Ann Cottone, on her admitted adultery being the cause of the couple's marital breakdown.  Apparently desperate to do and say anything to brighten the odds for their daughter and to win her an undeserved level of alimony and other property distribution amidst her admitted sins and egregious conduct to destroy the couple's family by maintaining an improper relationship with a worker hired to better the couple's home after Plaintiff suffered a devastating stroke, Defendants made out their knowingly false affidavits intending to lash out at Plaintiff.   Lauren Ann Cottone's South Carolina lawyer, Mr. Jonathan E.B. Lewis, is representing her in the South Carolina Family Court case now pending and styled as *Lauren Ann Cottone v. Erik Benjamin Cherdak*, Case No. 2022-DR-10-519 (pending in the Family Court of South Carolina, in the Ninth Judicial District at Charleston).  Mr. Lewis is not licensed to practice law in Florida.  In that case, Mr. Lewis urged a motion on behalf of Defendant alleging knowingly false missives of domestic abuse that never happened and, in fact, that are completely inapposite to the fact that Lauren Ann Cottone and her friends made out knowingly false police reports in Charleston, South Carolina on September 20, 2021 alleging that Plaintiff was at a location in Charleston harassing Lauren Ann Cottone and doing so with threats of gun violence. Suffice it to say that after extensive investigation by the Charleston County Police, it was determined that Plaintiff Cherdak was never in South Carolina or Charleston as alleged by Lauren Ann Cottone at the time, that Plaintiff had never engaged in any sort of domestic violence or abuse of any kind, and never threatened anybody with gun violence at any time. Sgt. Peters of the South Carolina police department and other law enforcement personnel including officers in Montgomery County, Maryland will be appearing as witnesses at least by video-taped deposition to attest to the fact that even Lauren Ann Cottone advised them that Plaintiff had never engaged in any sort of domestic violence or abuse of any kind.  Plaintiff has not spoken with his estranged wife, Lauren, since October, 2021.   Lauren Ann Cottone (apparently with Defendants' encouragement) has instructed the couple's sons to not communicate with Plaintiff.  Apparently, because Lauren Ann Cottone and her friends made out such outrageous and false claims to the Charleston County Police Department (as recorded by the Charleston, South Carolina 911 Emergency Response and Dispatch Center on September 21, 2021), a significant police response was dispatched—an event that Mr. Lewis, Lauren's attorney, refers to as an instance of SWATTING.  At no time has Plaintiff taken any action to cause dispatch of any law enforcement to any place where Plaintiff was temporarily staying—namely, 55 Chadwick Drive in Charleston, South Carolina—the home of Lauren's friends.  Plaintiff can tolerate a lot of bad blows by a lot of folks, but will vehemently defend and pursue any false claims made against him as evidenced by the instant case, as evidenced by the case of *Harrison M. C. Cherdak v. ACT, Inc.* litigated in the

be used in a Family Court in South Carolina in a matter between Plaintiff and Defendants' daughter on her admitted adultery being the cause of the couple's marital breakdown.

31.    Defendants intentionally acted to and did in fact cause the Plaintiff to endure mental suffering and extreme and outrageous worry on being falsely labeled and accused of domestic abuse and, more particularly, child abuse.

### D. Conspiracy to Harm

32.    Plaintiff hereby incorporates by reference all of the allegations of all prior sections and the points stated therein as if repeated now in their entirety.  Plaintiff additionally alleges:

33.    In Florida a conspiracy between (1) two or more people is actionable when they undertake (2) to do an unlawful act or to do a lawful act by unlawful means; (3) the doing of some overt act in pursuance of the conspiracy's aims; and (4) damage to the plaintiff as a result of the acts performed pursuant to the conspiracy. *See Walters v. Blankenship*, 931 So.2d 137, 140 (Fla. 5th DCA 2006). For a claim of

---

U.S. District Court in Maryland (Southern Division in Greenbelt when his son was accused of cheating on the ACT—the only case ever settled with the ACT in favor of a alleged cheater.), as evidenced by Plaintiff significant cooperation with Maryland-based Law Enforcement when Plaintiff's youngest son was to be arrested on drug possession, sale and distribution charges for which that son's friends made out false claims to rat him out.  It is indeed dumbfounding that Defendants and their daughter, Lauren A. Cottone, encouraged Plaintiff to spend more than 2 years defending the couple's son, Harrison, on allegations of cheating on the ACT prior to entry into college and all of a sudden, the Defendants are now calling the Plaintiff a domestic abuser and a child abuser.  Plaintiff seeks his day in court and the highest level of punitive damages for the egregious acts of the Defendants to defame the Plaintiff.  It also is dumbfounding that Defendants called and spoke with Plaintiff several years ago to thank Plaintiff profusely for helping to keep their grandsons out of trouble.  Indeed, enough is enough.

civil conspiracy to be actionable a separate actionable underlying tort or wrong is required. *See Florida Fern Growers Ass'n, Inc.; see also, Wright v. Yurko,* 446 So.2d 1162 (Fla. 5th DCA 1984). There is no requirement that each co-conspirator commit acts in furtherance of the conspiracy; it is sufficient if each conspirator knows of the scheme and assists in some way. *Charles v. Fla. Foreclosure Placement Ctr., LLC,* 988 So. 2d 1157, 1160 (Fla. 3d DCA 2008). In the case of *Blatt v. Green, Rose, Kahn & Piotrkowski,* 456 So.2d 949, 951 (Fla. 3d DCA 1984), the court held that "the gist of a civil action for conspiracy is not the conspiracy itself, but the *civil wrong* which is done pursuant to the conspiracy and which results in damage to the plaintiff"; *see also Phelan v. Lawhon,* 2017 WL 1177595 (Fla. 3d DCA 2017) (civil conspiracy claim must show independent wrong that would be an actionable wrong if it was committed by one person). Normally, when a party sues a co-conspirator for conspiracy, the co-conspirator may be held accountable for the full amount of the damages caused, regardless of whether he committed the underlying tort or just conspired with another to commit the underlying tort.

34.     The Defendants are hereby notified that in Plaintiff's assertion of a civil conspiracy claim, he hereby animates a significant exception to the otherwise strict hearsay rule, which usually prevents the admission of out of court statements offered to prove the truth of the matter asserted. When a plaintiff urges his conspiracy claim/cause of action, any statement made by a co-conspirator in furtherance of the conspiracy is considered an exception to the hearsay rule and is

admissible at trial. This hearsay exception regularly allows testimony or documents to be admitted at trial that otherwise would not be.  Any and all communications between the Defendants in furtherance of the conspiracy complained of herein—and any communications in any form between each or both of the Defendants and any other person in furtherance of the conspiracy (such as between Defendants and any person who assisted in the preparation of the Defendants' affidavits in Exhibits 1 and 2, respectively) are discoverable and admissible at trial in this case.  Such communications are not limited to writings including letters, email, texts, but also include, and are not limited to, verbal communications about which the Defendants may be deposed and compelled to respond to questions under oath.  Plaintiff will be taking the depositions of the Defendants especially but will be forced to incur expenses for protection as Defendant Vincent Cottone threatened and lunged at Plaintiff in a prior court proceeding.

35.    Plaintiff specifically incorporates the descriptions and allegations of the wrongs committed by and corresponding harms caused by the Defendants as asserted in Plaintiff's aforementioned claims for Defamation *per se*, Defamation by Implication, and Intentional Infliction of Emotional Distress under Florida law.

36.    To be abundantly clear, the Defendants profess to be husband and wife.  *See*, for example, Exhibits 1 and 2 at ¶¶ 4, respectively (each swearing under oath that each is the other's spouse, namely husband and wife).  Both of the Defendants

acted to do unlawful acts as explained in detail in connection with Plaintiff's claim for defamation *per se*. Signing their knowingly false affidavits, attempting to make those affidavits bear evidentiary effect and to possibly dupe courts in which such affidavits may be filed while knowing that Plaintiff has never engaged in any abuse let alone child abuse of any kind, and publishing and sending those affidavits to third parties either directly or through intended proxies were acts in furtherance of the conspiracy aimed by the Defendants to tell dangerous, damaging lies to harm the Plaintiff. Here, on good and reliable information and belief, Defendants were counseled by Attorney Jonathan E.B. Lewis (not a member of the Bar of the State of Florida) to make out their knowingly false and defamatory (*per se*) affidavits; Mr. Lewis in the position of very likely being named in a cross-claim by the Defendants for his acts to counsel the Defendants to act to harm the Defendant both in connection with acts in furtherance of their conspiracy and in connection with their underlying torts. If Defendants failed to seek Florida counsel prior to signing their affidavits containing knowingly false statements amounting to legal conclusions accusing Plaintiff of abusing Defendants' daughter, Lauren Ann Cottone, and engaging in child abuse, and having those affidavits notarized to give those affidavits alleged evidentiary affect despite their lies, then that failure to seek good counsel prior to signing a knowingly defamatory and false affidavit is an egregious act of omission that they knowingly and intentionally allowed to take place in furtherance of the conspiracy.

Defendant Vincent Cottone was the president of a major newspaper, the Eagle Tribune out of North Andover, Massachusetts, and he certainly should have known better and he should have certainly appreciated the fact that he was doing wrong, bearing false witness against the Plaintiff, and now he and his Defendant wife must be called to the courtroom to answer for their egregious and harmful conduct and to be forced to compensate Plaintiff for their wrongs.

37.     Further evidence in the formation of a conspiracy are the obvious facts (1) that the Defendants affidavits are essentially mirror copies—different only in the use of proper names and respective pronouns; and (2) that the Defendants used the same Notary Public to attest to Defendants' presentation and appearance to be sworn to tell the truth; (3) that the Defendants had Mr. Lewis prepare their affidavits to contain substantially the same false statements especially those contained in both paragraph nos. 12 in each of their affidavits in Exhibits 1 and 2; and (4) that Defendants instructed Mr. Lewis to send copies of Defendants' affidavits and to publish by proxy copies of their affidavits by email into several states and to broadcast Defendants' affidavits to numerous people as specified *supra*. Especially because the Defendants are so alike in substance, it is clear that the Defendants acted in concert and in conspiratorial combination to harm the Plaintiff by preparing, signing affidavits containing knowingly false statements that are defamatory *per se*.

38.     In addition to and separate from the wrongs complained of in connection with Plaintiff's claim for defamation *per se* and otherwise as set forth *supra*, Plaintiff claims costs of suit and damages related to having to file this action to seek both damages to compensate Plaintiff for harms suffered as a result of Defendant's wrongful and intentionally tortious conduct to defame the Plaintiff and for having to separately move for a preliminary injunction in this Court that will Court to stop the Defendants from further publishing their knowingly false and defamatory statements. The Defendants are hereby on notice that Plaintiff will be seeking a Preliminary Injunction pursuant to Fed. R. Civ. P. Rule 65, especially given the fact that the evidence of Defendant's underlying wrongs and torts were written by the Defendants themselves, respectively, were caused to be notarized by themselves, and were published by their own acts and those done through proxy on their instruction as set forth in this Complaint.

## PRAYER FOR RELIEF

In addition to any specific prayers for relief set forth in connection with Plaintiff's claims and causes of action as pleaded *supra*, Plaintiff prays for the following relief and remedies listed in seriatim with no intention to convey any particular level of importance or entitlement in the Plaintiff:

A.     Compensatory damages including, specifically, damages to be determined by a jury to compensate Plaintiff for pain and suffering from the date of Defendants' first publication of their affidavits, damages required to reimburse

Plaintiff for costs incurred through the date of trial and beyond in association with any and all related medical expenses, damages required to compensate Plaintiff for having to take any corrective actions including, but not limited, any and all reputational corrective actions necessary to rid any network and digital communications systems of any reference to or images of Defendants affidavits in Exhibits 1 and 2, and damages necessary to post corrective statements to be approved by this Court in newspapers both online and in print for five years from the date of the jury's award.  In no event shall compensatory damages whether specifically identifiable at the time of trial or otherwise general in nature be less than $2,000,000 as to be determined by a properly empaneled jury.  Plaintiff will certainly request a jury instruction calling for presumption of malice and general damages and in accepting such presumption that the jury shall not award compensatory damages in an amount less than $2,000,000.  Indeed, because Plaintiff is entitled to damages related to his claim for defamation and libel per se based on Defendants' publication of their knowingly false affidavits in Exhibits 1 and 2, Plaintiff is entitled to the absolute presumption of harm warranting significant damages especially as malice aforethought is a foregone conclusion. See Again, "[t]he significance of the classification of a communication as actionable per se lies in the fact that its victim need not plead or prove malice (except where a privilege is involved) or special damage because malice and the

occureence [sic] of damage are both presumed from the nature of the defamation." *Wolfson v. Kirk* , 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973);

B.     Punitive damages in an amount necessary to punish the Defendants jointly and severally, and sufficient in the Court's view to deter the Defendants and others from engaging in any future conduct similar in nature and effect as contemplated in this Complaint.  In no event shall Plaintiff consider punitive damages under Florida law in an amount less than 3-times all compensatory now believed due and proper and thus no less than $6,000,000;

C.     Plaintiff prays that any and all damages shall be recoverable jointly and severally.

D.     Injunctive Relief necessary to enjoin and stop Defendants from making defamatory statements about the Plaintiff that are untrue, unfounded and without any basis in truth.  Plaintiff further prays for a permanent injunction requiring Defendants to publish at their own cost and expense written, public apologies in Florida, South Carolina, and Washington, Boston, and Washington, DC newspapers (1) admitting to defaming Plaintiff as contemplated by this Complaint, and (2)  apologizing to the Plaintiff and to all their grandchildren for their actions in making defamatory statements about the Plaintiff; and

E.     Injunctive relief in the form of an order directing Defendants to each spend 250 hours directly helping abused children involved in or otherwise associated with a recognized Florida-based program for abused youth so that

Defendants learn about the wrongfulness of their own actions and so that they may learn skills in understanding the impact of genuine abuse upon young people.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury.

## SUBMISSION

On the facts, claims and causes of action set forth herein, Plaintiff submits this, his Original Complaint, to be adjudicated in this Honorable U.S. District Court for the Middle District of Florida in accordance with all applicable law and rules governing the full and fair adjudication on the merits of this case. All necessary forms including a Civil Coversheet, fees and forms-in-blank (summons) have been submitted herewith and to the Clerk's Office for official handling by this Honorable Court. Upon receipt of executed summons from the Court, Plaintiff will effectuate service of process in accordance with controlling law.

It is *therefore*,

Respectfully submitted,

Erik B. Cherdak    9/26/2022
149 Thurgood Street Gaithersburg, Maryland 20878
Ph. 202.330.1994, email: ebcme@me.com

SIGNED IN GAITHERSBURG, MARYLAND, this 26th Day of September, 2022.

46